_____

JOHN DENOFA,                          :
                                      :
              Petitioner,             :          Civ. No. 13-7830 (RBK)
                                      :
       v.                             :          **OPINION**
                                      :
STEPHEN D'ILIO, et al.,               :
                                      :
              Respondents.            :
_____ :

**ROBERT B. KUGLER, U.S.D.J.**

## I.       INTRODUCTION

Petitioner is a state prisoner and is proceeding *pro se* with a petition for writ of habeas

corpus brought pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury of murder.  He

is currently serving a life sentence, with 30-year parole ineligibility. Petitioner raises several

claims in his habeas petition, one of which includes an argument that the New Jersey court that

presided over his trial failed to submit the question of territorial jurisdiction to the jury.  For the

following reasons, the habeas petition will be denied.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

The following evidence and testimony was presented at Petitioner's trial, in which he was

convicted of the murder of Rachel Siani.[1]  Her body was found on April 1, 2000, in Burlington

Township, New Jersey, beneath the Delaware River Turnpike Bridge, just across from the State

of Pennsylvania.  It was apparent that she had fallen or was thrown from the bridge because there

_____

[1] This factual and procedural background is taken from the New Jersey Supreme Court opinion
on petitioner's direct appeal that was decided on June 5, 2006.  (*See* Dkt. No. 9-17 at pp. 3-9.)

was a blood stain on the bridge's retaining wall, no tire tracks or drag marks in the area, and an indentation underneath her body.

Ms. Siani had last been seen alive with Petitioner entering an Econo Lodge Hotel adjacent to the strip club (Diva's) where she worked, in Levittown, Pennsylvania, on March 29, 2000. That night, Ms. Siani was smoking marijuana with her friend, Ms. Rebecca Yavorsky, in the parking lot of Diva's when she (Ms. Siani) saw Petitioner appear near the club's entrance. Ms. Siani left Ms. Yavorsky's car and joined Petitioner. A local police officer who happened to be in the parking lot of the hotel then watched Petitioner and Ms. Siani enter the hotel together.

A subsequent police investigation discovered a 30-inch blood stain beneath the second-floor room registered to Petitioner at the hotel, and that stain matched Ms. Siani's DNA. Her keys were found in that same area. And, a second DNA match was found in the bed of Petitioner's red Dodge truck. Video footage of that same truck crossing and returning through the turnpike toll booth on the bridge depicted a lifeless body in the bed of the truck, though the identity of the truck's driver was not clear from the video.

Piecing together this and other forensic and circumstantial evidence, the State's theory at trial was that Ms. Siani had fallen (or been thrown) from Petitioner's motel room, placed into the back of Petitioner's truck, driven over the turnpike bridge, and thrown off the bridge into New Jersey. Critically, the State's position was that Ms. Siani was still alive, albeit unconscious, when she was thrown from the turnpike bridge. The State based its position on the testimony of Dr. Faruk Presswalla, New Jersey State Medical Examiner, who conducted an autopsy on Ms. Siani's body. Detailing the type and degree of the injuries she sustained, he opined that the bridge fall killed her.

Petitioner did not testify at trial, or present an alibi defense through his own witnesses. Rather, he presented his defense through cross-examination of the State's witnesses. His theory was that someone else obtained his truck keys, murdered Ms. Siani, and used his truck to dispose of her body.

Petitioner's trial counsel did not raise any issue at trial about the location of the murder, or otherwise challenge the New Jersey court's jurisdiction; however, on direct appeal, Petitioner challenged the court's jurisdiction through new appellate counsel. On appeal, Petitioner argued that a state court's jurisdiction is necessarily an element of a state crime, and that each element must be presented to the jury. Because the trial judge did not *sua sponte* instruct the jury to decide in which state Ms. Siani died, Petitioner argued that the trial judge *de facto* decided jurisdiction without the jury's input, in direct contravention of his constitutional due process rights. Petitioner was successful on appeal—the Appellate Division reversed the conviction on jurisdictional grounds without addressing his remaining challenges. *See State v. Denofa*, 375 N.J. Super. 373, 396 (App. Div. 2005).

The State and Petitioner both petitioned for certification and, on June 5, 2006, the New Jersey Supreme Court granted certification, reversed the Appellate Division, and reinstated his conviction. *See State v. Denofa*, 187 N.J. 24 (2006). The Court reasoned that, even though jurisdiction was an element of the crime that should have been submitted to the jury, there was insufficient evidence presented at trial from which the jury could have concluded that the murder was completed in Pennsylvania. In reaching its holding, the New Jersey Supreme Court pointed out that no expert testimony had been presented at trial to challenge Dr. Presswalla's conclusion that Ms. Siani died in New Jersey. (Dkt. No. 9-17 at pp. 27-32.) Thus, in effect, it held that the error was harmless. (*Id.*)

Nearly a year later, on May 30, 2007, Petitioner filed his first application for post-conviction relief ("PCR") in the Superior Court of New Jersey, Law Division, Burlington County. (Dkt. No. 9-18.) Because one of Petitioner's trial counsel (John L. Call, Jr., Esq.) had since become a judge in Burlington County, the PCR application was transferred to Camden County. (Dkt. No. 9-22.) Coincidentally, the other trial counsel that worked alongside Call, Albert J. Cepparulo, Esq., also became a state court Judge in Pennsylvania.[2]

Throughout the PCR proceedings, Petitioner filed several supplemental and amended petitions and briefs, asserting ineffective assistance of trial and appellate counsel claims, claims already asserted in his direct appeal, and other claims. Most of the filings were by his PCR counsel, David S. Nenner, Esq., but he also filed some papers *pro se*. Petitioner requested an evidentiary hearing, but the court did not hold one. A factual record was developed, however, including a certification from trial counsel Call. Ultimately, the PCR was denied on November 13, 2008 in a detailed opinion that rejected his request for an evidentiary hearing. (Dkt. No. 9-25.)

On December 19, 2008, Petitioner's PCR counsel filed a notice of appeal in the New Jersey Superior Court, Appellate Division, seeking review of the PCR trial court denial. (Dkt. No. 9-32 at p. 6).[3] Neither counsel nor Petitioner took action on the case for a time, and it was dismissed for lack of prosecution on March 23, 2010. On May 11, 2010, Petitioner sought to vacate the dismissal, and requested permission to either proceed *pro se* or to be appointed new

---

[2] *See* www.martindale.com/Albert-J-Cepparulo/1530610-lawyer.htm (visited 6/29/2017).

[3] The Court is unable to locate a copy of the notice of appeal in the parties' exhibits. This date is taken from the State's recitation of procedural history, and it does not appear to be disputed by Petitioner.

PCR counsel. (Dkt. No. 9-38.) The Appellate Division granted his request, and reinstated his appeal on July 6, 2010. (*Id.*)

Petitioner filed new papers with the Appellate Division, this time seeking a summary reversal of the PCR trial court or, in the alternative, a remand directing the PCR trial court to hold an evidentiary hearing on his ineffectiveness claims. (Dkt. Nos. 9-31, 9-36.) He made this request via a motion filed on August 11, 2010. (Dkt. No. 9-31.) The Appellate Division denied Petitioner's request on October 12, 2010, noting that Petitioner's over 150-page submission to the Appellate Division necessarily rendered his request inappropriate for summary adjudication. (Dkt No. 9-36 at p.2.) This 150-page submission included additional discovery from trial counsel Call's and Cepparulo's files that had not been submitted to the PCR trial court. (*See* Dkt. No. 9-41.)

Following extensive additional briefing by Petitioner and the State, the Appellate Division went on to rule on Petitioner's appeal of the PCR denial. The appellate court issued its ruling affirming the denial on September 19, 2012, in a short *per curiam* opinion. The court commended the PCR trial court for its thorough analysis of Petitioner's claims, and affirmed both the denial of Petitioner's claims and the decision not to hold an evidentiary hearing. (Dkt. No. 1-3.) Petitioner filed a motion for reconsideration in December 2012, which was promptly denied by the Appellate Division on January 10, 2013. (Dkt. No. 9-58.) He then sought certification from the New Jersey Supreme Court on February 9, 2013. (Dkt. No. 9-59.) Certification was denied on September 4, 2013, without prejudice to Petitioner filing a second PCR application raising ineffectiveness of PCR counsel claims. (Dkt. No. 9-61.)

While the appeal of his initial PCR application was pending, Petitioner filed a second PCR petition in state court, in January 2011. That petition was initially dismissed by the PCR

trial court without prejudice pursuant to a state law that bars the filing of a second PCR petition while another petition is pending.  (Dkt. No. 9-65).  After the initial PCR proceedings concluded, on October 3, 2013, Petitioner requested permission to reinstitute his second PCR, and that request was granted.   (Dkt. Nos. 9-67; 9-72.)

Before Petitioner's second PCR was ruled upon, he filed the instant Petition for federal habeas relief in this Court on December 23, 2013.  (Dkt. No. 1.)  Several months after Petitioner filed the instant action, the state PCR trial court denied Petitioner's claims in a letter opinion dated February 11, 2014.  (Dkt. No. 9-72.)  Petitioner appealed.  Because the PCR trial court ruled on the second PCR application without first giving Petitioner the opportunity to fully brief his claims, the Appellate Division reversed and remanded on March 7, 2016.  *See State v. Denofa*, 2015 WL 10428285, at *2-3.  To this Court's knowledge, Petitioner's second PCR application is still pending in state court.[4]

When he filed his Petition before the Court, Petitioner raised four challenges:  (1) a territorial jurisdiction jury instruction challenge; (2) a cumulative ineffective assistance of trial counsel challenge; (3) an appellate counsel ineffective assistance challenge; and (4) a PCR counsel ineffective assistance challenge.  (*See* Dkt. No. 1.)  In his petition, he states that, for the last three of these challenges, he "relies on the pro-se brief filed on appeal of the initial PCR application, and on the forthcoming memorandum of law." (Dkt. No. 1 at pp. 7, 8, 10)  For the first challenge, he relies upon his appellate counsel's brief filed on direct review.  (*Id.* at p. 5.)  While Petitioner stated that he would file a memorandum of law, (*id.* at pp. 8, 10.), he failed to do so.

---

[4]   Neither party has updated the Court on the status of the second PCR application.

Shortly after he filed his petition, the Court notified Petitioner of the Third Circuit Court of Appeal's ruling in *Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000), that he must include all of his habeas claims in one petition or else face the possibility that any future-brought claims could be barred under the Antiterrorism Effective Death Penalty Act ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996). (Dkt. No. 2.) The Court gave Petitioner the option of having his petition ruled upon "as is," or withdrawing his petition to add additional claims. (*Id.* at p. 2.) The order stated that if Petitioner did not respond the order within 30 days, the Court would consider his petition "as is." (*Id.* at p. 3.) Petitioner did not respond to the order. The Court then ordered an answer from Respondent, the Attorney General of the State of New Jersey ("State"). (Dkt. No. 3.) The answer was ultimately filed on May 12, 2014. (Dkt. No. 9.)

Thereafter, Petitioner filed two motions to stay, which were both denied. In the motions to stay, Petitioner argued that he needed time to fully exhaust the claims raised in his second state PCR petition. As explained most recently in this Court's December 22, 2015 ruling, Petitioner's request for a stay was denied because the bulk of the claims he raised before this Court were based upon claims raised in his initial state PCR application—not the second one. (*See* Dkt. No. 17 at pp. 5-6). In his motions to stay, Petitioner further argued that he intended to raise here claims that his state PCR counsel should have raised in the initial PCR application. This Court rejected that argument, noting that he did not actually raise those particular claims in his Petition here. (*Id.*)

Petitioner also filed a motion for extension of time to file a reply to the State's answer, which extension was granted. (Dkt. Nos. 14-15.) However, Petitioner never filed the reply. The Court now rules on the Petition.

### III.    HABEAS CORPUS LEGAL STANDARD

Under AEDPA, "[f]ederal habeas courts cannot grant relief with respect to any claim that was adjudicated on the merits in State court unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 280 (3d Cir. 2016) (quoting 28 U.S.C. § 2254(d)) (internal quotation marks omitted). Clearly established law refers to legal principles found in U.S. Supreme Court decisions rendered prior to or at the time of the state habeas decision. *Id.*

"A state court decision is contrary to clearly established federal law if the state court (1) applies a rule that contradicts the governing law set forth in Supreme Court precedent or (2) confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that reached by the Supreme Court." *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)) (internal quotation marks omitted). "A state court decision is an unreasonable application of federal law if the state court identifies the correct governing legal principle, but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 281 (quoting *Williams*, 529 U.S. at 413) (internal quotation marks omitted).

Lastly, a state court's determination of facts is unreasonable when its findings lack sufficient support in the record. *Id.* While state courts factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), "[d]eference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect ...." *Id.* (quoting *Miller–*

*El v. Cockrell*, 537 U.S. 322, 340 (2003)).  However, a federal court may conclude that a state court's factual findings are unreasonable only when there is clear and convincing evidence that contradicts the state court's findings.  *See id.*

## IV.    DISCUSSION

As noted above, Petitioner raises four claims in his habeas petition.  The four claims are:

1.  Petitioner was deprived of his right to a fair trial when the law division neglected to provide adequate jury instructions ("Claim I").

2.  Petitioner's trial counsel was cumulatively ineffective resulting in prejudice.  ("Claim II").

3.  Petitioner's appellate attorney was prejudicially ineffective during direct review. ("Claim III.")

4.  Petitioner's PCR attorney was prejudicially ineffective for neglecting to research, investigate, advance and support numerous claims petitioner had insisted be advanced. ("Claim IV").

This Court has previously explained to Petitioner that PCR counsel claims are not cognizable on federal habeas review; therefore, Petitioner is not eligible for relief based on Claim 4.  *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising

under section 2254.").[5]  The court will now turn to the substantive analysis of Petitioner's other three asserted grounds for relief.[6]

### A.    Ground I – Jury Instructions

Petitioner argues, in his Petition, that his right to a fair trial was violated by the state trial court's failure to properly instruct the jury.  He does not explain, in the Petition itself, exactly which jury instruction(s) he is challenging; however, he directs the Court to Points 1 and 3 of his appellate counsel's brief before the New Jersey Appellate Division, in support of his argument. (*See* Dkt. No. 1 at p. 5).  His former appellate counsel's brief makes two specific jury instruction claims:    that the trial court failed to instruct the jury on territorial jurisdiction; and that the trial court failed to instruct on the lesser-included offense of aggravated manslaughter.

### 1.    *Territorial Jurisdiction Element*

Petitioner's most intriguing argument is that the trial court failed to submit the territorial jurisdiction element to the jury.  At trial, that New Jersey had sufficient jurisdiction to prosecute

---

[5]   The Court notes that, once his second PCR petitioner is ruled upon by the state courts, Petitioner may seek permission from the Court of Appeals to file a successive habeas petition in federal court that asserts the ineffective assistance of trial counsel claims that he argues his PCR counsel failed to raise on initial review.  *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012) (holding that ineffectiveness of assistance of PCR counsel may serve as basis for excusing procedural default); *Evans v. Pierce*, 148 F. Supp. 3d 333, 337 (D. Del. 2015) ("Whether or not *Martinez* triggers the § 2244(b)(2)(A) exception to the second or successive bar is an issue that must be determined by the Third Circuit Court of Appeals, and not by [a district] court.").  This Court expresses no opinion on whether such a petition would be meritorious.

[6]   The State argues in its Answer that the Petition is mixed (meaning that some claims therein have been properly exhausted and some have not) and, therefore, subject to dismissal.  *See generally Rhines v. Weber,* 544 U.S. 269, 277–78 (2005) (describing a mixed petition).  In its analysis of Petitioner's subsequently filed motion to stay, this Court determined that Petitioner's claims are all rooted in his initial state PCR petition, which was exhausted in the state courts. For this reason, the Petition is not mixed and the Court may consider each of Petitioner's claims. Further discussion of exhaustion is found *infra* in connection with the cumulative ineffective assistance of trial counsel claim.

the crime was apparently presumed.  Petitioner's trial counsel never raised the issue, and there was no discussion by the trial judge or prosecutor about jurisdiction.

Petitioner first raised the issue on his direct appeal, where he argued that territorial jurisdiction is an element of each state crime and, therefore, it must be proven in order to support a criminal conviction. Agreeing with Petitioner, the Appellate Division vacated his conviction, reasoning that

> [i]n any jury trial, where the proofs establish the existence of a factual question as to a critical feature of the case—in a criminal prosecution, any element of the crime charged, including territorial jurisdiction—the jury must be adequately instructed as to that aspect even where no countervailing evidence has been introduced.

*State v. Denofa*, 373 N.J. Super. at 395. In the Appellate Division's view, the proofs presented at trial created a factual question regarding jurisdiction that should have been submitted to the jury for resolution.  *Id.*

The New Jersey Supreme Court, on its review, rejected the Appellate Division's characterization of the proofs at trial.  While the New Jersey Supreme Court agreed that territorial jurisdiction is an element that must be submitted to a jury, the Court held that there was no factual dispute in Petitioner's case.  *State v. Denofa*, 187 N.J. at 35-43.  More specifically, the New Jersey Supreme Court explained that the question of jurisdiction should be addressed as early as practicable in a trial.  But where the parties do not raise the issue, the Supreme Court noted, "the [trial] court is not obliged to sift meticulously through the record in search of any combination of facts" that would support a jurisdiction charge.  *Id.* at 42.  The Court went on to clarify that "the standard of review is 'whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn

therefrom, a reasonable jury could find' beyond a reasonable doubt that the crime occurred within the State." *Id.* at 44 (quoting *State v. Reyes*, 50 N.J. 454, 458-59 (1967) (per curiam)). Viewing the evidence in the light most favorable to the State, the New Jersey Supreme Court concluded that there was sufficient record evidence to support jurisdiction. *Id.* at 46.[7]

The Court based its conclusion that there was sufficient evidence of jurisdiction on the following evidence presented at trial:

> In support of the inference that Rachel's death occurred at the Delaware River Turnpike Bridge, the State offered Dr. Presswalla, a medical examiner and expert forensic pathologist. Dr. Presswalla testified that in his opinion Rachel was alive at the time she was thrown from the bridge. Dr. Presswalla formed that opinion because Rachel's liver was "totally pulpified," and only "a large force impact on the abdomen" caused by a fall from the height of the bridge, as opposed to the height of defendant's second floor motel room, could have caused that type of devastating injury and the accumulation of 400 cc of blood in the peritoneal cavity.
>
> We cannot agree with the Appellate Division that Dr. Presswalla's testimony concerning the cause and place of Rachel's death was "equivocal." Medical opinion testimony is not rendered with certainty, but with reasonable certainty. *See, e.g., State v. Fortin*, 178 N.J. 540, 597, 843 A.2d 974 (2004) ("An expert offering scientific opinion testimony must do so within a reasonable degree of certainty or probability."). In that respect, Dr. Presswalla's testimony met the test. In his own words, responding to questions, Dr. Presswalla left little doubt about where Rachel died.
>
> > A: My opinion is that she sustained a near fatal head injury from the fall from the Econo Lodge, but the fall from the bridge produced the liver injury, and she died as a result of the combination of both these injuries.
> >
> > Q: Well do you have an opinion as to whether or not Rachel Siani was still alive when she went from

---

[7] Part of this calculus was that there is a New Jersey statutory inference of jurisdiction that comes into play when a body is found within the borders of the State. *See id.* at 44 (quoting *N.J.S.A.* 2C:1-3(d); *id.* at 46).

the top of that bridge to the bottom of the ground in New Jersey?

A: Yes. That is why I'm saying that she died as a combination of both injuries. Had she died—even though that was a serious injury and she could have died from the injury from the fall at the motel, she wasn't dead at the time that she went over the bridge, and that's why I used the combination—

Q: How do you know that, Doctor? How do you know that she wasn't dead when she went over the bridge, in your opinion?

A: The liver injury that I showed you resulted in 400 cc's of bleeding into the peritoneal cavity. If she was already dead, a liver injury taking place in a dead body, although it would be—may lacerate, will not bleed out beyond maybe about 100 cc's. That is just a little blood that may be there, might ooze out.

Q: Why is that? Just explain that. Why?

A: Because when you're dead, you don't have any blood pressure. It's the blood is under pressure in order to bleed. If it's not under pressure, then if there is blood on the surface where you make a breach, that little blood will just leak out.

Q: So based on the quantity of blood in the peritoneum from the lacerated liver, that's how you conclude that Rachel still had to have blood pressure.

A: Yes.

Nothing in that verbal exchange clearly indicated that territorial jurisdiction was at issue. Moreover, defendant neither cross-examined Dr. Presswalla concerning his opinion on the location of Rachel's death nor introduced expert or lay testimony suggesting that Rachel died in Pennsylvania, before her body was thrown from the bridge. Defendant did not contest the location at which the crime was committed; he simply maintained that he was not the murderer. Under those circumstances, the trial court was not required to comb through the evidence to raise a lack of

jurisdiction defense that defendant, apparently, did not consider tenable.

*Id.* at 45-46.

As noted above, in his Petition to this Court, Petitioner explained that he relies on his appellate counsel's brief before the Appellate Division on this issue. (*See* Dkt. No. 1 at p. 5). In that brief, his counsel generally argued that the trial court's failure to charge violated the Sixth Amendment of the U.S. Constitution as well as the Fourteenth Amendment. Counsel cited two U.S. Supreme Court cases in support of the argument: *United States v. Gaudin*, 515 U.S. 506 (1995), and *In re Winship*, 397 U.S. 358 (1970). *Gaudin* is also cited in the Appellate Division's ruling. *State v. Denofa*, 373 N.J. Super. at 391.

*In re Winship* and *Gaudin* stand for the proposition that the Sixth and Fourteenth Amendments protect accused persons from conviction of a crime where proof of each element of that crime has not been proven. 397 U.S. at 364; 515 U.S. at 519. More succinctly put, all "[e]lements of a crime must be charged in an indictment and proved to a jury beyond a reasonable doubt." *United States v. O'Brien*, 560 U.S. 218, 224 (2010); *id.* at 237 (Stevens, J., concurring) (discussing *In re Winship*).

A failure to charge the jury on all elements of a crime does not automatically result in a constitutional violation, however. In a case analyzing a trial court's failure to instruct on the causation element of a crime, the U.S. Supreme Court has explained that "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 US 145, 155 (1977).[8] To determine

---

[8] Although *Henderson* pre-dates *Gaudin*, post-*Gaudin* Third Circuit cases continue to rely on *Henderson* for this point of law. *See, e.g., Albrecht v. Horn*, 485 F.3d 103, 129 (3d Cir. 2007);

whether there has been a constitutional violation, reviewing courts must compare the omission with all of the instructions that were actually given. *Id.* at 155-56.

Moreover, post-*Gaudin* U.S. Supreme Court precedent makes clear that failure to submit an element of a crime to a jury is subject to a constitutional harmless error analysis. In *Neder v. United States*, 527 U.S. 1 (1999), the U.S. Supreme Court addressed a federal district court's refusal to submit the element of materiality to a jury in a tax fraud case. Although the government, in that case, conceded that the federal district court's refusal was a clear violation of *Gaudin*, the Court did not invalidate the conviction because it found the error harmless. *Id.* at 15.

According to *Neder*, to determine if a *Gaudin* error is harmless, a reviewing court must ask "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is 'no,' holding the error harmless does not reflect a denigration of the constitutional rights involved." *Id.* at 19 (internal alterations and quotation marks omitted). Otherwise put, the failure to instruct on the element is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 16 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

Here, the New Jersey Supreme Court, in its 2006 decision reinstating Petitioner's conviction, engaged in the precise sort of analysis that *Neder* dictates. As recounted above, the New Jersey Supreme Court applied what was, in effect, a harmless error standard. The Court first acknowledged that territorial jurisdiction was an element of the

---

*Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005); *Dozier v. Hendricks*, 199 F. Appx. 165, 168 (3d Cir. 2006) (citing *Henderson* with approval).

crime, and that the trial court committed error by not submitting the element to the jury. Then, the Court went on to analyze the direct and circumstantial evidence presented at trial. It specifically looked at the expert testimony presented by Dr. Presswalla, and determined that—based on his expert testimony—no reasonable jury could have found that Ms. Siani died in Pennsylvania rather than New Jersey. In reviewing the evidence, the Court made clear that it was applying a reasonable doubt standard. *State v. Denofa*, 187 N.J. at 44.

Because the analysis undertaken by the New Jersey Supreme Court in Petitioner's direct appeal mirrors the *Neder* harmless error analysis, there is no basis for federal habeas relief here. While the state court did not cite to *Gaudin, Neder,* or other U.S. Supreme Court precedent, all that matters is that its ruling comports with federal law. *Johnson v. Lamas*, 850 F.3d 119, 134 n.21 (3d Cir. 2017) ("AEDPA 'does not require citation of [the Supreme Court's] cases [nor] ... even ... awareness' of them, 'so long as neither the reasoning nor the result ... contradicts them.'") (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)). Petitioner has not shown that the last reasoned state court decision violated a clearly established federal law as set forth by the United States Supreme Court. *Accord Dozier v. Hendricks*, 199 F. Appx. 165, 168 (3d Cir. 2006) (affirming denial of habeas relief where petitioner argued that jury instructions omitted an element). Nor has he challenged the factual determinations made by the New Jersey Supreme Court in its ruling.[9] Accordingly, Petitioner's territorial jurisdiction jury instruction challenge under Claim 1 is denied.

---

[9]  Petitioner's appellate counsel argued in the appellate brief that the testimony of Dr. Ragasa, another county medical examiner, who performed an autopsy on Ms. Siani's body, was inconclusive on the location of Ms. Siani's death, and that Dr. Presswalla admitted that the "head

## 2.    *Aggravated Manslaughter Charge*

Petitioner's second jury instruction challenge, as put forth by his appellate counsel on direct review, is that the state trial court should have instructed the jury on the lesser-included offense of aggravated manslaughter.  The prosecution requested this charge at trial, but trial counsel objected and the trial court independently determined that the charge was not necessary.  (Dkt. No. 9-83 at pp. 4-5.)  In the trial court's view, there was insufficient evidence presented at trial from which a jury could have found aggravated manslaughter.  (*Id.* at pp. 11-12.)[10]  The trial judge further noted that Petitioner had discussed the potential charge with counsel and knowingly, intelligently, and voluntarily waived any request to charge the lesser-included offense.  (*Id.* at p. 10.)

The claim that the trial court erred in refusing to charge on aggravated manslaughter was addressed on direct appeal.  The Appellate Division did not provide a detailed rationale for denying this claims on the merits, but simply stated:

> We . . . reject the argument, advanced for the first time on appeal, that defendant was entitled to a lesser-included aggravated manslaughter charge notwithstanding his strongly articulated

---

and liver injury" played a prominent role in her death.  (*See* Dkt. No. 1-1 at pp. 23-24).  Because this is an appellate court brief that predates the New Jersey Supreme Court's ruling, it does not contain any argument about how the New Jersey Supreme Court's factual determination, based on its reading of Dr. Presswalla's testimony, constituted unreasonable determinations of the facts in light of the evidence presented at trial.

[10]

> "[A]lthough [the prosecutor] makes the argument that the jury may possibly make that finding, given my view of the record in this case, I don't think there really is a rational basis for the jury to find the lesser included offense.  They would have to go a long way in analyzing and stretching—what I'll term stretching the testimony in this case to reach the issue of whether, in fact, Mr. Denofa should be found guilty of . . . the lesser included aggravated assault."

*Id.*

17

> objection to such a charge when the State requested its inclusion.
> There was no error in the trial court's evaluation of this issue,
> either, alone plain error. *See State v. Jenkins*, 178 *N.J.* 347, 358-
> 61, 840 *A.2d* 242, 249-51 (2004); *State v. Brent*, 137 *N.J.* 107, 113-
> 16, 644 *A.2d* 583, 585-87 (1994).

*State v. Denofa*, 375 N.J. Super. at 76-77.[11]  This ruling, however limited in analysis, constitutes

a ruling on the merits and is entitled to AEDPA deference.  *See Johnson v. Williams*, -- U.S. --,

133 S.Ct. 1088, 1094 (2013) ("§ 2254(d) does not require a state court to give reasons before its

decision can be deemed to have been 'adjudicated on the merits.'  Rather, . . . when a federal

claim has been presented to a state court and the state court has denied relief, it may be presumed

that the state court adjudicated the claim on the merits") (citation and alterations omitted).

As with his territorial jurisdiction argument, Petitioner relies on his appellate brief to state

his arguments.  Problematically, this claim is discussed in the brief as a state law violation.  (*See*

Dkt. No. 1-1 at pp. 32-37.)  In the table of contents of the brief, counsel references the Fifth,

Sixth, and Fourteenth Amendments to the U.S. Constitution.  However, the brief does not point

to any U.S. Supreme Court ruling that the trial court's alleged error supposedly contravenes.

This Court is aware of the U.S. Supreme Court's decision in *Beck v. Alabama*, 447 U.S. 625, 627

(1980), directing state courts to charge lesser-included offenses in capital cases, but is not aware

of any directly applicable U.S. Supreme Court precedent addressing noncapital cases such as

Petitioner's.  And, jury "instructions that contain errors of state law may not form the basis for

federal habeas relief."  *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993).  Accordingly, Petitioner has

---

[11]  Petitioner raised this issue a second time in his first application for post-conviction relief but
the trial court refused to consider the claim on state law grounds, noting that it had been already
addressed on direct appeal.  (*See* Dkt. No. 9-30 at pp. 6-7).  The Appellate Division affirmed
"substantially for the reasons set forth by [the trial PCR judge] in his comprehensive written
opinion." *State v. Denofa*, 2012 WL 4093643, at *1 (N.J. App. Ct. Sept. 19, 2012).

not shown that the trial court's ruling contravened U.S. Supreme Court law and is not entitled to habeas relief on this aspect of Ground 1.

B.     Ground 2 – Cumulative Ineffective Assistance of Trial Counsel

As an initial mater, the Court addresses whether Petitioner's cumulative error of trial counsel claim is properly exhausted.  Under AEDPA, a federal district court may not grant habeas relief unless the petitioner "'fairly present[ed]' [the] federal claim[ ] to the highest state court before bringing [it] in federal court." *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002) (citing *Whitney v. Horn*, 280 F.3d 240, 250 (3d Cir. 2002)).[12]  For a claim to be fairly presented, the same legal theory must have been presented at all available levels of the state system.  *See Brown v. Superintendent Greene SCI*, 834 F.3d 506, 521 (3d Cir. 2016) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)); *Cristin v. Brennan*, 281 F.3d 404, 410 (3d Cir. 2002) (citing *Picard*, 404 U.S. 270, 275–76; *Swanger v. Zimmerman*, 750 F.2d 291, 295 (3d Cir. 1984)).  The purpose of the exhaustion requirement is to afford state courts "'an opportunity to act on [the petitioner's] claims before he presents those claims to a federal court in a habeas petition'." *Brown*, 834 F.3d at 512 n.7 (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999)).  Cumulative ineffective assistance claims are independent claims that must be exhausted on their own accord.  *Collins v. Sec'y of Pennsylvania Dep't of Corr.*, 742 F.3d 528, 542-43 (3d Cir. 2014).

The State argues in its Answer that this claim is unexhausted because, at the time that he filed his Petition, Petitioner had pending a state court appeal of the denial of his second PCR petition.  And, it interpreted Petitioner's second PCR petition as raising ineffective assistance

_____

[12]  "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).

claims.  After the State filed it Answer, however, as noted above, this Court ruled in its denials of Petitioner's motions to stay that the Petition does *not* incorporate any claims raised in his second PCR petition.  Rather, only those claims raised in his initial PCR petition are included.

Moreover, the record reveals that Petitioner presented the cumulative ineffective assistance claim to all three levels of the state courts on his initial PCR.  He presented it to the PCR trial court in his Verified Petition for Post-Conviction Relief.  (*See* Dkt. No. 9-18 at p. 2.) The PCR trial judge ruled upon the claim, albeit only in one sentence.  (Dkt. No. 9-30 at p. 34). Petitioner raised the cumulative ineffective assistance claim on appeal of the PCR court's ruling as well.  (Dkt. No. 9-42 at p. 2.)   And, he incorporated this argument into his certification petition to the New Jersey Supreme Court.  (Dkt. No. 9-59 at p. 5 ("Defendant reasserts all issues presented before the Appellate Division with reference to his Appellate Division brief.")).

Finally, when the New Jersey Supreme Court denied him certification, it did so without prejudice to him bringing ineffective assistance of PCR counsel claims in a second PCR petition. (Dkt. No. 9-61 at p. 1.)  The pending second PCR petition of which the State speaks relates to this order.  Accordingly, that this second PCR petition—which does not, and could not, raise ineffective assistance of PCR counsel claims—was still pending at the time he filed the instant Petition is of no moment, and this Court concludes that the cumulative ineffective assistance claim is exhausted.

### 1.     *Petitioner's Arguments*

Petitioner does not specify in his Petition the trial counsel errors that he is challenging as cumulative, but he points the Court to his *pro se* brief filed on his appeal of his initial PCR application denial in state court.  (Dkt. No. 1 at p. 7.)  In that *pro se* PCR brief, Petitioner criticizes a number of trial counsels' decisions, including:  (1) the decision not to retain a second

forensic expert after the first retained expert, Dr. Adams, concluded from his review of the evidence that he could not testify consistent with the defense's theory; (2) the failure to present the theory that Ms. Siani had died in Pennsylvania; (3) the failure to request a territorial jurisdiction instruction; and (4) the failure to call several lay fact witnesses, including his wife, to support the "keys defense"—the defense theory that Petitioner had not killed Ms. Siani and transported her body but that another person who had access to his truck keys had done so.  (Dkt. No. 9-42 at pp. 10-16, 28, 42-43.)

Additionally, Petitioner contends in his *pro se* appellate brief that his trial counsel withheld information from him during the course of the proceedings, and that counsel made strategic trial decisions without his permission. (*Id*. at pp. 33-34.)  As an example, he asserts that trial counsel Call did not promptly give him a copy of Dr. Adams'—the forensic expert's—report for Petitioner's own review, and that he refused to call Dr. Adams at trial despite Petitioner's request that he be called.  Petitioner claims that Dr. Adams could have testified that Ms. Siani died in Pennsylvania, which would have supported Petitioner's theory that someone else killed Ms. Siani, stole his truck, and dropped her lifeless body off the bridge.  (*Id.* at p. 36.)  He argues that, if this testimony had been presented, the jury may have rendered a non-guilty verdict based on lack of jurisdiction.  (*Id.* at p. 39.)

Lastly, he asserts that trial counsel Cepparulo failed to timely provide the state prosecutors with private investigator interviews and Dr. Saferstein's expert report on DNA evidence obtained from the crime scene, and that these failures prevented Cepparulo from presenting or relying upon the statements and expert report at trial.  (Dkt. No. 9-42 at p. 42.)  Petitioner argues that these statements and the report would have been used to impeach state witnesses.  Further, he claims that trial counsel lied about the date that he became aware of the

statements and report when confronted by the state trial court about why he had not timely provided the discovery.[13]

The Court notes that, in this pro se appellate brief, Petitioner intermixes his trial counsel ineffective assistance claims with his PCR counsel ineffective assistance claims. This is, perhaps, because Petitioner argues that his PCR counsel failed to "full advance and support" the trial counsel ineffectiveness claims. (Dkt. No. 9-42 at p. 41.) Because the PCR counsel ineffective assistance claims are not part of his cumulative ineffective assistance claim here, this Court's analysis will address only the trial counsel ineffective arguments that were presented to the PCR trial court. More simply put, many of the alleged instances of ineffective assistance that Petitioner discusses in his pro se appellate brief were not presented to the PCR trial court.

So, while Petitioner makes numerous arguments in his pro se appellate PCR brief, there were only four instances of ineffective assistance that were presented to the PCR trial court and ruled upon by that court on the merits. (Claims that Petitioner had already raised on direct appeal were procedurally barred and dismissed.)[14] The alleged instances of ineffective assistance of trial counsel were presented as individual claims. Petitioner further argued that, cumulatively, these purported errors denied him of a fair trial. (Dkt. No. 9-18 at p. 2.)

His individual claims were that trial counsel was/were ineffective for: (a) "telling the jury in his opening address that he would provide evidence establishing that another person murdered the victim and then failing to do so ….", (*id.*); (b) failing to request a territorial

_____

[13]  Petitioner also mentions, in passing, that his trial counsel impermissibly entered into stipulations and "secretly negotiated" a plea agreement that he ultimately rejected. (Dkt. No. 9-42 at pp. 54, 67.)  He does not provide any detail about these allegations.

[14]  The Appellate Division order denying Petitioner's motion for summary disposition of his PCR appeal succinctly summarizes his claims.  (*See* Dkt. No. 9-36 at pp. 1-2.)

jurisdiction jury instruction, (*id.*); (c) not retaining a second competent forensic pathologist to establish the location and manner of death (Dkt. No. 9-23 at pp. 1-2.); and (d) failing to offer material testimony from several witnesses suggested by Petitioner, (*id*). To be clear, only those arguments and instances that were actually presented to the PCR trial are fully exhausted. Therefore, this Court construes the Petition as raising in his cumulative ineffective assistance claim here the four alleged instances of ineffective assistance that were presented to the PCR trial court.

2.  *State Court Ruling*

After thoroughly recounting each of the claims on PCR asserted in Petitioner's several filings, the PCR trial court issued a 35-page ruling denying those claims. (Dkt. No. 9-30.) Then, the court ruled on each of Petitioner's individual ineffective assistance claims, explaining why either or both of his trial counsel (Call and Cepparulo) had not been ineffective. Based on this, the court denied Petitioner's cumulative ineffective assistance claim as follows:

> The Court finds that the petitioner has not proved a prima facie case on any of his allegations. The petitioner has not proved any ineffectiveness of counsel. For that reason there can be no issues for appellate counsel to have raised *nor can there be any cumulative effect of errors to have deprived petitioner of a fair trial.*

(*Id.* at p. 34.) (emphasis added). Petitioner appealed this decision. On appeal, the appellate court affirmed for the reasons stated by the PCR trial court. Therefore, this Court will analyze the PCR trial court's reasoning to determine if the state court's ruling was contrary to or an unreasonable application of U.S. Supreme Court law. *See Ylst v. Nunnemaker*, 501 U.S. 797, 802-3 (1991) (holding that courts should "look through" to lower court decisions when a higher court ruling does not contain legal analysis).

3.  *Legal Principles*

"The Sixth Amendment guarantees to every criminal defendant 'the Assistance of Counsel for his defence.'" U.S. Const. amend. VI. *Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 588 (3d Cir. 2015), *cert. denied sub nom*. *Saranchak v. Wetzel*, 136 S. Ct. 1494 (2016). Criminal defendants are entitled to the effective assistance of counsel; it is the means by which the right to a fair trial is protected. *See id.* When a criminal defendant has been denied effective assistance, he or she may bring an ineffective assistance of counsel claim on collateral review.

These ineffective assistance of counsel claims are governed by the U.S. Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), which creates a two-prong test that defendants must overcome: (1) that trial counsel's performance was objectively unreasonable; and (2) the defendant was prejudiced by the deficient performance. (*Id.* at 688, 694.) To succeed on the first prong, a petitioner must show that his counsel's representation "fell below an objective standard of reasonableness" as defined by "prevailing professional norms." *Saranchak*, 802 F.3d at 588 (quoting *Strickland*, 466 U.S. at 687-88). A petitioner shows prejudice by demonstrating a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at 694.) In the habeas context, the question is not just whether trial counsel performance was deficient but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Premo v. Moore*, 562 U.S. 115, 123 (2011).

Cumulative ineffective assistance of counsel claims are standalone constitutional claims. *Collins*, 742 F.3d at 542-43. Federal courts may review these claims on habeas even where individual errors, on their own, would not satisfy *Strickland*. As the Third Circuit has explained:

> Individual [ineffective assistance of counsel] errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional

right to due process. Cumulative errors are not harmless if they had
a substantial and injurious effect or influence in determining the
jury's verdict, which means that a habeas petitioner is not entitled
to relief based on cumulative errors unless he can establish actual
prejudice.

*Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (internal quotation marks omitted) (citations

omitted). The Court notes that, while the Third Circuit continues to recognize the viability of

cumulative error claims, *see Collins, supra*, it has acknowledged that its cumulative error

jurisprudence may not "constitute clearly established federal law as determined by the Supreme

Court for the purposes of deference under AEDPA." *Saranchak*, 802 F.3d at 590 n.7 (citing

*Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)).[15]

        4.      Analysis

As noted, in its thorough analysis of each of the Petitioner's individual ineffective

assistance of counsel claims, the PCR trial court applied the first prong of the *Strickland* test and

concluded that Petitioner had not shown that his counsels' performance was objectively

unreasonable.  While the court did not hold an evidentiary hearing, it was presented with a

certification from trial counsel Call and numerous documents from both parties.  After

concluding that Petitioner has failed to present any *prima facie* cases of ineffective assistance,

the court denied the cumulative ineffective assistance claim, stating that any "cumulative effect

of errors [could not] have deprived petitioner of a fair trial" because he had not proven any of his

counsels' conduct was objectively unreasonable.  (Dkt. No. 9-30 at p. 34.)

The PCR trial court applied the correct legal test in analyzing Petitioner's cumulative

ineffective assistance claim.  As explained by the Third Circuit in *Collins*, "[t]he cumulative

---

[15]   The Tenth Circuit has noted a circuit split on this issue.  *Hooks v. Workman*, 689 F.3d 1148,
1194 n.24 (10th Cir. 2012).

error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process." 742 F.3d at 542. In other words, the cumulative error doctrine allows a petitioner who has not been able to show that individual errors prejudiced him to bring a separate claim premised on the idea that all of the harmless errors, taken together, constitute a deprivation of a constitutional right. *Albrecht*, 485 F.3d at 139 (holding that "a cumulative-error analysis . . . aggregates all the errors that individually have been found to be harmless, and therefore not reversible" to determine whether together "they had a substantial and injurious effect or influence in determining the jury's verdict."). Where there are no errors, there can be no cumulative error claim. Therefore, the PCR trial court's ruling restatement of the law is accurate.

Although Petitioner brings only a cumulative ineffective assistance claim, and does not challenge the state courts' individual ineffective assistance rulings, to determine whether habeas relief is warranted on this claim, this Court must first consider each of the individual ineffective assistance of counsel claims brought before the PCR trial court. If the PCR trial court's disposition of each of these individual claims was a reasonable application of *Strickland*, then that court's disposition of the cumulative ineffective assistance claim necessarily withstands review as well. For this reason, the Court addresses each alleged instance of individual ineffective assistance in turn.

        a.    <u>Failure to substantiate theory that another person killed Ms. Siani after promising to do so in opening statement</u>

Petitioner argued before the PCR court that trial counsel Cepparulo promised in his opening statement that he would present evidence of another individual having killed Ms. Siani,

but then failed to present that evidence.[16]  The PCR court engaged in a thorough analysis of this

claim, quoting extensively from the trial court record.  It explained that, contrary to Petitioner's

claims, trial counsel Cepparulo did *not* state that he would concretely establish that another

person had committed the murder.  (Dkt. No. 9-30 at p. 19.)  Rather, counsel stated, "Now, I

wish that I could supply all of you with a witness running back from those doors saying, I did.

That's Perry Mason . . .  Or I wish I could have somebody on the witness stand break down and

say, I did it.  But I think that's pretty much TV."  (*Id.* quoting 3T:54-8 to 14.)  According to the

PCR court, what he did state was that he would "try and determine what other people could have

been responsible for her death …." (*Id.* quoting 3T:54-15 to 19.)  He also noted that he would

highlight her "inherently dangerous" lifestyle.  (*Id.* quoting 3T:54-25 to 55-6.)  Specifically, he

mentioned some possible perpetrators—Rick Hamburg (the jailed boyfriend), Jason Francis (the

employee of Diva's club that had been obsessed with Ms. Siani), and several others.  (*Id.* at pp.

20-21 quoting 3T:56-13 to 19; 3T:56-20 to 57-9.)  Based on this exhaustive review of the trial

record, the PCR court concluded that Petitioner had not demonstrated that trial counsel

Cepparulo made a promise to show who had killed Ms. Siani.

Next, the PCR court considered Petitioner's contention that trial counsel failed to present

evidence at trial that another individual committed the murder.  (*Id.* at p. 21.)  The PCR court

rejected this contention, detailing how trial counsel Cepparulo elicited testimony from Detective

Villamil—an investigatory detective—that the police failed to pursue several leads that pointed

to other suspects.  For example, Detective Villamil admitted that he did not attempt to verify

Jason Francis' alibi.  (*Id.* at p. 22 quoting 8T:138-2 to 193-24.)  According to the PCR court,

---

[16]  It is not clear from Petitioner's pro se brief on appeal from the PCR ruling whether he intends
to challenge, in this Court, this aspect of his cumulative ineffective assistance of trial counsel
claim.  Nonetheless, the Court addresses it here for the sake of completeness.

counsel also elicited that the detective did not follow up on any of the drug-related leads or the woman who had recently been in an altercation with Ms. Siani.  (*Id.* at p. 25 quoting 8T:131-186.)  Moreover, the court noted, Richard Hamburg had called the Moorestown Police Station, suggesting that the body found near the turnpike was that of Ms. Siani.  Trial counsel elicited from Detective Villamil that he did not even attempt to speak with Mr. Hamburg.  (*Id.* quoting 8T:91.)  Indeed, the PCR court pointed to a number of potential suspects that Detective Villamil admitted, during cross-examination, he did not seriously investigate.  In addition to Jason Francis and Richard Hamburg, there was also Ms. Siani's drug supplier, Chris, and Mike Reinert, who had a "crush" on her.  (*Id.* at p. 24 quoting 8T:88-131.)

The PCR court reasoned that trial counsel "through cross examination of the state's lead detective established facts to show what could be described as a defective investigation of possible suspects as well as motives for the assault on Ms. Siani.  He chose to elicit this information on cross examination of the state's witness where he could ask leading questions instead of trying to call potentially unavailable or hostile witnesses."  (*Id.* at p. 25.)  Based on this understanding of trial counsel's performance, the PCR court concluded that counsel acted strategically.  The court cited *Strickland*'s admonition to refrain from viewing counsel's decisions in hindsight.  (*Id.* at p. 26.)

This Court finds that the PCR court adhered to *Strickland*'s directives.  And, by thoroughly reviewing the trial record to confirm that counsel did, in fact, present evidence from which the jury could have concluded that there were several suspects who were not investigated, the PCR court reasonably concluded that trial counsel Cepparulo acted strategically.  This Court has reviewed the trial transcripts and finds the PCR trial court's recounting of the record to be

accurate.  Therefore, the Court concludes that the PCR trial court's assessment of this alleged instance of ineffective assistance was a reasonable application of *Strickland*.

          b.      <u>Failure to request a jury instruction on territorial jurisdiction</u>

Before the PCR trial court, Petitioner argued that his trial counsel were ineffective for failing to challenge the New Jersey trial court's jurisdiction over the murder.  In his view, counsel should have argued that the court lacked jurisdiction and then presented expert testimony to establish that Ms. Siani had died before her body was driven into New Jersey.

The PCR trial court applied *Strickland* in denying Petitioner's claim.  While Petitioner and PCR counsel argued that the trial counsel failed to request a jury instruction on territorial jurisdiction as a matter of ineptitude, the PCR court concluded that the purported "failure" was a strategic decision.  The court relied on the certification of trial counsel Call, who explained that Dr. Adams—the expert he had retained—agreed with Dr. Presswalla's conclusions about the manner of Ms. Siani's death.  Specifically, Dr. Adams agreed that Ms. Siani had first been dropped 15 feet (which amounted to the distance between Petitioner's hotel room window and the ground) before she was dropped off the bridge.  (Dkt. No. 9-30 at p. 14.)  According to the PCR court's reading of Call's certification, this testimony was consistent with Dr. Presswalla's opinion and there would not have been any benefit to calling him at trial.

Additionally, the PCR court explained, trial counsel Call strategically chose not to contest New Jersey jurisdiction because, if jurisdiction was found lacking, Petitioner could have been tried in Pennsylvania.  (Dkt. No. 9-30 at p. 15.)  Were he tried there, he could have been subjected to the death penalty and more stringent bail requirements.  Moreover, the court noted, there had been far more media coverage of the murder in Pennsylvania, which may have made it more difficult for Petitioner to procure an untainted jury.  (*Id.*)

Petitioner takes issue with this preferred forum rationale. He argues: "Setting aside the fact that the [New Jersey] jury would not have revealed why it acquitted, [trial counsel] Call's alleged strategy would ultimately be to ensure that Defendant got convicted." (Dkt. No. 9-42 at p. 58.) He goes on to argue that counsel must have believed that "the only way to protect Defendant against facing the death penalty in Pennsylvania was to make sure Defendant got convicted in New Jersey." (*Id.* at p. 59.)

Having reviewed the PCR court decision, and the governing case law, this Court concludes that its decision is not contrary to or an unreasonable application of *Strickland*. The PCR court was persuaded by trial counsel's explanation that mounting a successful jurisdictional defense would have been detrimental to Petitioner because he could have then been tried in Pennsylvania and faced the death penalty. Under *Heath v. Alabama*'s dual sovereignty principle, "[w]hen a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offenses'." 474 U.S. 82, 88 (1985). Via this principle, there is no Fifth Amendment[17] double jeopardy violation when two states prosecute a defendant for a criminal act that spanned both states. *See id.* Therefore, the PCR court was correct in concluding that Petitioner could have faced a separate trial in Pennsylvania had his New Jersey prosecution been dismissed.

---

[17]

      The Fifth Amendment to the Constitution of the United States provides that "[n]o person shall be ... subject for the same offense to be twice put in jeopardy of life or limb...." U.S. Const. amend. V. The Amendment was designed to "protect[ ] against both successive prosecutions and successive punishments for the same criminal offense."

*United States v. Roland*, 545 F. App'x 108, 114 (3d Cir. 2013) (quoting *Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 800 (1994)).

Noticeably, however, the PCR court did not acknowledge that, under the dual sovereignty principle, Pennsylvania had the authority to separately prosecute Petitioner regardless of whether New Jersey continued with its prosecution of him. As the U.S. Supreme Court explained in *Heath*,

> [a] State's interest in vindicating its sovereign authority through enforcement of its laws by definition can never be satisfied by another State's enforcement of its own laws. Just as the Federal Government has the right to decide that a state prosecution has not vindicated a violation of the "peace and dignity" of the Federal Government, a State must be entitled to decide that a prosecution by another State has not satisfied its legitimate sovereign interest. In recognition of this fact, the Court consistently has endorsed the principle that a single act constitutes an "offence" against each sovereign whose laws are violated by that act. The Court has always understood the words of the Double Jeopardy Clause to reflect this fundamental principle ….

474 U.S. at 93. The Pennsylvania Supreme Court states it more simply: "successive prosecutions by two states for the same conduct are not barred by the Double Jeopardy Clause." *Com. Dept. of Transp. V. McCafferty*, 563 Pa. 146, 156 (2000). Viewed against this backdrop of the law, it appears that counsel may not have fully appreciated dual sovereignty law because his certification appears to assume that Petitioner could *not* have been retried in Pennsylvania if he was first tried in New Jersey, when in fact he could have.

Nevertheless, in his certification to the PCR court, trial counsel Call gave other reasons for not challenging the New Jersey court's jurisdiction. He claimed that Petitioner "would have had less time to prepare for trial" if tried in Pennsylvania and that the "longer time between the arrest, indictment, and trial" that he would enjoy in New Jersey was needed to "explore avenues of defense and retain experts." (Dkt No. 9-29 at pp. 24-25.) Relatedly, he noted that Petitioner might not have been eligible for bail in Pennsylvania. (*Id.* at p. 25.) Because Petitioner did not present any certifications to the PCR court that contradicted these statements, this Court cannot

say that it was an unreasonable application of *Strickland* for the PCR court to conclude that the decision not to pursue a jurisdiction defense was strategic.[18]

c.    <u>Failure to call Dr. Adams to testify about place of death</u>

Related to his territorial jurisdiction argument, Petitioner contends that both his trial counsel—Call and Cepparulo—were ineffective for failing to utilize Dr. Adams to establish Pennsylvania as the place of Ms. Siani's death. Applying *Strickland*, the PCR court concluded that his trial counsels' decision to forego using Dr. Adams was not objectively unreasonable. (Dkt. No. 9-30 at pp. 9-11.) In reaching its decision, the court explained that neither Petitioner nor his PCR counsel provided documentation of Dr. Adams expert opinion and, without that documentation, the court could not determine whether the expert testimony would have affected the outcome of the proceedings. The court went on to note that neither Petitioner nor his PCR counsel had submitted any affidavits or an evaluation by another licensed pathologist who would have supported the jurisdictional defense. "This failure to submit affidavits and reports," the court ruled, "amounts to nothing more than bald assertions that he was denied the effective assistance of counsel and renders petitioner's petition void of a factual basis to establish that trial counsel was deficient." (*Id.* at p. 11.)

The court further relied on Call's certification that he did not use Dr. Adams because the doctor agreed with the State's forensic pathologist, Dr. Presswalla, that Ms. Siani suffered from two falls—one in the motel parking lot and one from the turnpike bridge. (*Id.* at p. 14.) In his certification to the PCR trial court, trial counsel Call explained that, because Petitioner was insistent upon suggesting at trial that Ms. Siani had been attacked in the hotel parking lot and

---

[18]   The Court notes that Petitioner's second PCR application, which is currently proceeding before the state courts, likely argues that his PCR counsel erred in not providing certifications to substantiate the claims made in his initial PCR.

dropped from shoulder height to the ground beneath Petitioner's hotel room window, Dr. Adams' testimony would have been damaging to this defense theory. Call admitted in his certification that he did not recall whether Dr. Adams had concluded that Ms. Siani died in Pennsylvania or New Jersey. (Dkt No. 9-33 at p. 36.) However, the PCR trial court found it persuasive that Dr. Adams' testimony would have contradicted the defense's theory, and Petitioner did not submit any testimony to challenge Call's description of what occurred. (Dkt. No. 9-30 at pp. 14.)

Petitioner has not demonstrated that the PCR trial court's analysis of this alleged instance of ineffective assistance was erroneous. As the court noted, Petitioner failed to present any evidence to substantiate his claim that Dr. Adams would have offered a favorable expert opinion on the location and manner of Ms. Siani's death. Without any countervailing evidence offered, the PCR trial court was free to rely on the facts found in trial counsel Call's certification. And, on federal habeas review, this Court must defer to a state court's factual finding, unless the petitioner shows, by clear and convincing evidence, that those findings are unsupported by the record. *See* 28 U.S.C. 2254(d)(2) ("habeas . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. "); *id.* at 2254(e)(1) ("a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

In his papers before this Court, Petitioner has pointed to evidence, that was not presented to the PCR trial court, suggesting that Dr. Adams communicated to trial counsel that Ms. Siani had died in Pennsylvania. He points, specifically, to a March 27, 2002 letter written by trial

counsel Call that recounts a conversation he had with Dr. Adams, in which Dr. Adams suggested

Ms. Siani died in Pennsylvania. Petitioner contends that this letter undermines trial counsel

Call's statement in his certification to the PCR trial court that he did not recall whether Dr.

Adams would have testified that Ms. Siani died in Pennsylvania. In the letter, Call states:

> The hits just keep on coming . . .
>
> On March 26, 2002, I conferred with Dr. Adams concerning his preliminary conclusions in the case . . . *Based on his evaluation of the evidence, Dr. Adams does believe that Ms. Siani was dead prior to the fall from the bridge*. Unfortunately, Dr. Adams does not reach a favorable conclusion with regard to [Dr. Presswalla's] "two-drop theory."
>
> Dr. Adams concludes that the opinion of Dr. Presswalla is supported by physical evidence, and in Dr. Adams' opinion:
>
> •   Ms. Siani was rendered unconscious by several blows to the throat and manual strangulation.
> •   Her body was pushed out of the window, falling to the pavement below.
> •   Finally being thrown over the railing of the bridge, falling in excess of 100 feet to the ground.
>
> The physical evidence, in Dr. Adams' opinion, would support Dr. Presswalla's "two-drop theory."
>
> To say this is a "blow" to the defense would be akin to stating that "the Titanic was stopping for ice." The location of the blood splatter on the pavement below Jack's room becomes a devastating piece of evidence based upon the conclusions of Dr. Presswala, and now Dr. Adams.

(Dkt. No. 9-24 at p. 5) (emphasis added).

Typically, federal habeas courts may consider only that evidence that was presented to

the ruling state court. *Brown v. Wenerowicz*, 663 F.3d 619, 628 (3d Cir. 2011) (discussing

*Cullen v. Pinholster*, 563 U.S. 170 (2011)). Even assuming this Court could look to this

evidence, its consideration would not alter the Court's ruling here. For one, the letter bolsters

Call's statement that he did not utilize Dr. Adams because he agreed with Dr. Presswalla that Ms. Siani had been dropped from Petitioner's window. In addition, the letter does not clarify what would have been the exact contents of Dr. Adams' testimony if he were called at trial. This matters because, to present the jury with a fact question as to the location of Ms. Siani's death, Dr. Adams would have had to challenge Dr. Presswalla's conclusion that the 400 cc of blood in her peritoneal cavity indicated that she died from being thrown off the turnpike bridge. As discussed *supra*, Dr. Presswalla's expert opinion on this precise point was cited by the New Jersey Supreme Court as the jury's sole basis for concluding that Ms. Siani died in New Jersey.

Moreover, the existence of this letter does not call into question the veracity of Call's certification. He merely stated in his certification to the PCR court that he did not recall what Dr. Adams had determined. Petitioner further suggests that Call's inability to recall whether Dr. Adams concluded the victim died in Pennsylvania means that his decision not to utilize Dr. Adams was not a strategic one. (Dkt. No. 9-42 at p. 63.) He misses the larger point. Even if Dr. Adams could have opined that Ms. Siani died in Pennsylvania, as discussed *supra*, trial counsel made the tactical decision to keep the case in New Jersey because they believed Petitioner was more likely to have an unbiased jury, enjoy more favorable bail conditions, and potentially not face the death penalty. Accordingly, this aspect of the PCR trial court's ruling is a reasonable application of *Strickland*.

> d.    Failure to hire a second forensic pathologist

In addressing whether trial counsel should have challenged the New Jersey court's jurisdiction, the PCR trial court also analyzed Petitioner's argument that trial counsel should have called another forensic pathologist, apart from Dr. Adams, to show that Ms. Siani was killed outside the hotel in Pennsylvania. Rejecting this contention, the PCR court again noted

that Petitioner and his PCR counsel failed to produce an expert affidavit or certification to show that his trial counsel could have procured a favorable report from a forensic pathologist. (Dkt. No. 9-30 at p. 12.) All that Petitioner and his PCR counsel provided was a letter from Dr. Cyril Wecht, M.D., J.D., a forensic pathologist.

Dr. Wecht's letter explained that he reviewed the autopsy and toxicology reports, DNA-analyses, and other investigatory reports in Ms. Siani's case file. (Dkt. No. 9-40 at p. 56.) Based on his review of this information, Dr. Wecht suggested that Ms. Siani had not been strangled in Petitioner's hotel room or dropped/fallen from the room window. (*Id.* at p. 60.) In his view, there was "insufficient autopsy evidence . . . to assert, with a reasonable degree of medical certainty, that [Ms.] Siani was manually strangled." (*Id.*) He stated that it was "less likely that [Ms.] Siani fell from a height" and landed outside the hotel because her blood found on the sidewalk did not display "the typical blood spatter pattern, which should have been generated by such a high scale impact" and because "the fractures of the right tibia and fibula located 10 inches above the heel are inconsistent with a homicidal ejection from a window and forceful decent over a height of approximately 9 feet." (*Id.* at p. 61.) Based on this, Dr. Wecht concluded that there "exists a significant forensic probability that [Ms.] Siani may have sustained her injuries through other mechanisms of trauma," *e.g.*, she "may have been assaulted in the parking lot of the [hotel]." (*Id.*)

The PCR court noted several fatal flaws with Dr. Wecht's letter, implying that even if it had been certified or sworn to, it would have still been problematic. First, the court noted, the letter amounted to a "net opinion" under New Jersey Rule of Evidence 703 because Dr. Wecht had not based his opinion on any factual evidence or other data. (Dkt. No. 9-30 at p. 12.) This finding is curious given that the letter expressly states that Dr. Wecht reviewed the autopsy

reports and other case file records. Second, the PCR court explained, the court could not qualify

him as an expert because no curriculum vitae had been submitted. Importantly, the court further

noted that Dr. Wecht had been indicted for mail fraud, which would have affected whether the

court would have qualified him as an expert. Finally, the court found it important that Mr.

Wecht's letter "did not even attempt to challenge" Dr. Presswalla's testimony about the location

and cause of Ms. Siani's death, among other flaws. (*Id.* at p. 13.)

This Court concludes that the PCR court's analysis was a reasonable application of, and

was not contrary to, *Strickland*. It was certainly reasonable for the PCR trial court to conclude

that Dr. Wecht's then-pending indictment for mail fraud would have led the trial judge to not

accept him as an expert witnesses. More importantly, that Dr. Wecht did not challenge Dr.

Presswalla's conclusion regarding the 400 ccs of peritoneal blood supports the PCR trial court's

conclusion that Petitioner had not demonstrated that another forensic pathologist would have

opined that Ms. Siani had died in Pennsylvania.

In his papers to this Court, Petitioner has pointed to a certification he subsequently

obtained from Dr. Wecht. The certification is very limited in nature. Rather than repeating all of

the background information stated in the letter that had been presented to the PCR trial court, the

certification just recites the following:

> Evidentiary scene findings and evidentiary autopsy findings do not
> support the propositions that Rachel Siani was manually strangled
> and thrown through the window of a motel, falling over a height of
> nine feet and impacting the ground. There is a significant forensic
> probability that Rachel Siani may have been assaulted in the
> parking lot of the Econo Lodge Motel. This assault would account
> for some of her injury patterns, which may not have been sustained
> from her fall/drop from a bridge in the State of New Jersey. There
> are other plausible and highly probable mechanisms of trauma
> sustenance and causation, which apparently have not been
> considered by the prosecution.

(Dkt. No. 9-43 at p. 15.)  The certification references an attached case summary, but no further findings.  (*Id.*)

Considering this certification would not alter the Court's ruling here.  Even if Dr. Wecht could have testified at trial, nothing in this certification calls into question Dr. Presswalla's conclusion that Ms. Siani died from the fall from the New Jersey bridge.  Dr. Wecht suggests that Ms. Siani may have been attacked in the motel parking lot, and that this attack could have caused some her injuries, but he does not opine on whether she died before or after the fall in New Jersey.  Nor does he specifically contradict Dr. Presswalla's conclusion that the 400 ccs of blood in her peritoneal cavity supports his theory of death.  As with his letter, Dr. Wecht's certified statements would not have formed a basis for the jury to have rejected Dr. Presswalla's testimony and Petitioner has not shown that, had his trial counsel raised the jurisdictional challenge, there would have been a basis for the jury to conclude that Ms. Siani did not die in New Jersey.

As a further basis for its rejection of Petitioner's argument that trial counsel should have hired a second forensic pathologist, the PCR trial court relied on Call's description, in his certification, of his attempt to hire Dr. Claus P. Speth to render an expert opinion favorable to the defense.  (Dkt. No. 9-30 at pp. 15-16.)  According to Call's certification, he believed that would not be able to locate a reputable pathologist who would disagree with Drs. Presswalla's and Adams' medical opinions.  (Dkt. No. 9-29 at p. 23.)  So, he looked to Dr. Speth, a former county medical examiner who was known as a maverick in his field.  Dr. Speth could not appear at trial because of an unrelated criminal matter,[19] but counsel did intend to use him as a consultant once

---

[19]  Dr. Speth had been convicted of witness tampering in an unrelated matter.  *See State v. Speth*, 32 N.J.Super. 67 (App. Div. 1999).

Petitioner paid Dr. Speth's retainer. Unfortunately, a few weeks before trial, Call states in his certification, Dr. Speth had a family emergency and was no longer able to serve as a consultant. (Dkt. No. 9-29 at p. 24.) In light of these attempts to locate a second forensic pathologist, and the difficulties experienced with Dr. Speth, the PCR court concluded trial counsel acted reasonably in seeking another forensic pathologist and were, therefore, not ineffective. (*Id.* at p. 16.)

Overall, the PCR court's ruling that Petitioner had not demonstrated that his counsel were ineffective was a reasonable application of *Strickland*. The PCR court relied upon trial counsel Call's certification that he was not likely to locate another forensic pathologist to dispute Dr. Presswalla's opinion, especially since Call attempted to retain Dr. Speth and that expert became unavailable for consultation due to a family emergency. Petitioner has not pointed to any information in the record that contradicts Call's statements regarding Dr. Speth.

Finally, the PCR trial court noted that counsel also hired Dr. Richard Saferstein, a reputable forensic scientist, to review DNA evidence. After reviewing of the evidence, Dr. Saferstein concluded that the lack of Ms. Siani's DNA in Petitioner's hotel room was not helpful to Petitioner because even his own DNA was not found in the room. According to the PCR trial court, Dr. Saferstein further expressed to Petitioner's trial counsel that the lack of physical evidence in the motel room did not undercut the evidentiary value of the DNA evidence that had been obtained from the sidewalk beneath the hotel room and Petitioner's truck. Therefore, the expert's testimony would not have been favorable to the defense, and the PCR court concluded that the decision not call the doctor to testify was a permissible, tactical one. (Dkt. No. 9-30 at pp. 15-16.)

A review of the record reveals support for the facts relied upon by the court. Dr. Saferstein stated in a letter dated August 27, 2001 that he "reviewed the laboratory notes, quantiblots, and STR results for the DNA specimens" and concluded that stains found under the truck bedliner, on the bedliner, and on the wall all contained Ms. Siani's DNA. (Dkt. No. 9-29 at p. 43.) The letter further stated that this finding was consistent with the DNA findings of the New Jersey State Police Laboratory. (*Id.*) As for the lack of physical evidence in the hotel room, trial counsel Call noted in his certification that Dr. Saferstein explained this to him:

> the lack of physical evidence trying Rachel Siani to Room 223 was not a significant factor that would benefit defendant's case. He noted that although Ms. Siani's DNA was not present in the room, neither was Mr. Denofa's DNA. Dr. Saferstein further concluded that the fact that other hotel guests stayed in the room in the intervening period between the night of the murder and the time police collected evidence made it less likely that the DNA of Ms. Siani or Mr. Denofa would have been found in the room than if there had been no intervening residents of the room.

(Dkt. No. 9-33 at p. 37.)

In addition, a 2002 letter from trial counsel Call to Cepparulo describes the doctor's findings as "not of great assistance to [Petitioner]." (Dkt. No. 9-41 at p. 59.) [20] In particular, the letter notes Dr. Saferstein's conclusions that "[a]lthough minor points can be raised with regard to typographical errors and the failure of the State to examine certain evidence, . . . none of the errors or omissions come even close to being fatal to the State's case." (*Id.*) In Call's words, "[s]ince Dr. Saferstein has already confirmed that the DNA analysis is in order, we are still stuck with Rachel Siani's blood under the bed liner of [Petitioner]'s truck and the blood splatter containing Ms. Siani's blood on the pavement under [Petitioner's] room." (*Id.*) Call further

---

[20] Petitioner points to "Da172" in his brief as a description of Dr. Saferstein's "report." (Dkt. No. 9-42 at p. 16.) Rather than being a report, it is a September 4, 2002 letter from Call to co-counsel Cepparulo relaying Dr. Saferstein's comments.

noted, in the letter, that the doctor's assistant indicated to him that the doctor "would not be able to provide any type of 'expert assistance' in presenting [Petitioner's] theory with regard to 'lack of [DNA] evidence' in [the hotel room]." (*Id.* at p. 60.) [21]

Ultimately, the PCR trial court concluded that trial counsels' decision not to proceed with a second forensic pathologist was strategic, and this Court sees no reason to disturb that ruling. Counsel retained Drs. Adams, Speth, and Saferstein. Drs. Adams and Saferstein both generated opinions that were not fully helpful to Petitioner, and that buttressed the State's position. And, Dr. Speth was unavailable to testify at trial. These facts shows that counsel were diligent in seeking out experts who could aid Petitioner's case.

Under these circumstances, it was reasonable for the PCR trial court to conclude that trial counsels' decision not to use a second forensic pathologist is consistent with the rule of law laid out in *Strickland*. As noted above, Petitioner failed to present certifications or affidavits from

---

[21] Again relying on the brief appealing the PCR court's ruling in his petition before this Court, Petitioner argues that his trial counsel also should have called Dr. Ragasa to challenge Dr. Presswalla's testimony that Ms. Siani had been strangled (asphyxiated) prior to her death. (Dkt. No. 9-42 at p. 61.) Dr. Ragasa, the Burlington County Medical Examiner, performed the first autopsy on Ms. Siani's body. He concluded, contrary to Dr. Presswalla, that she had not been asphyxiated. *State v. Denofa*, 187 N.J. 24, 32 n.5 (2006).

Petitioner claims that his trial counsel promised him that Dr. Ragasa would be called to testify but then failed to call him. (Dkt. No. 9-42 at p. 61.) The PCR court did not separately address counsels' decision not to call Dr. Ragasa in its November 2008 ruling. This may be because, in raising the issue in his Second Amended Petition in Support of Post-Conviction Relief, Petitioner merely notes Dr. Ragasa's finding that Ms. Siani had not been asphyxiated; he uses the remainder of his argument to explain how Dr. Wecht's proposed expert opinion could have changed the outcome of his case. (Dkt. No. 9-23 at pp. 2-3.) As explained above, Dr. Wecht's opinion would not have been useful to him at trial. Moreover, that Ms. Siani may have not been asphyxiated does not establish whether she died in Pennsylvania or New Jersey. Therefore, even considering this alleged instance of ineffective assistance under a *de novo* standard, Petitioner has not shown how Dr. Ragasa's testimony would have altered the outcome of his case.

other experts who would have challenged the manner and location of Ms. Siani's death. Moreover, the record evidence described above substantiates the PCR trial court's finding that the decision not to call Dr. Saferstein at trial was strategic. Call understood Dr. Saferstein's assistant to indicate that Dr. Saferstein would not be able to testify on Petitioner's behalf at trial. Therefore, Petitioner has not shown that the PCR trial court erred, and this alleged instance of ineffective assistance may not serve as a basis for his cumulative error ineffective assistance claim.

e.    <u>Failure to present witnesses testimony</u>

At the outset, the Court notes that, in an individual ineffective assistance claim before the PCR trial court, Petitioner argued that other employees at Diva's should have been called to testify that spare keys were kept at the club. The PCR court rejected this claim of ineffective assistance on strategic grounds, relying on trial counsel Call's certification that he and Cepparulo did not call these witnesses because they believed the jury would not have looked favorably upon their testimony in light of their chosen employment. (Dkt. No. 9-30 at pp. 30-31.) The court further relied on Call's certification that they were concerned that calling these witnesses would only have highlighted how frequently Petitioner visited the club and became overly intoxicated. (*Id.*)

In his cumulative ineffective assistance claim before this Court, Petitioner has not pointed to any certifications from potential witnesses other than that of his wife. For completeness sake, however, the Court will note the PCR trial court's analysis of the other witnesses. In addition, the Court further notes that, in his arguments to this Court, Petitioner repeatedly references the "keys defense" that he claims his counsel failed to properly establish through witness testimony. As suggested *supra*, this defense is based on the idea that the true killer stole a spare set of

Petitioner's keys from the strip club and used Petitioner's truck to dispose of Ms. Siani's body. The following analysis should be understood against this backdrop.

Before the PCR court, Petitioner had presented an affidavit from his wife, in which she asserted that she would state the following: that Petitioner frequented the club and other drinking establishments; that he had a prior DUI offense; that Petitioner would often stay at the Econo Lodge Motel adjacent to Diva's after drinking; and that she had suggested he make extra keys and leave them with others when he was intoxicated. (Dkt No. 9-30 at p. 29.) The State presented a certification from trial counsel Call who stated that he and co-counsel Cepparulo "considered but rejected the idea of calling her as a witness" because they did not believe that she would be appear credible to the jury and because her testimony that he frequented strip clubs would only accentuate his behavior. (*Id.*) In addition, Call noted, Petitioner's wife did not indicate that she had multiple sets of keys made for the truck. (*Id.*) Based on this certification, the PCR court concluded that trial counsels' decision not call Petitioner's wife was a strategic one and denied this claim, applying *Strickland*. (*Id.*)

Petitioner pointed the PCR court to additional witnesses that could have supported the defense theory during the initial PCR proceedings. These witnesses included Kimberly Lautero, Chelsee N. Skurla, Jason Frances, John Nappi, and a number of others. Because neither Petitioner nor his PCR counsel had filed affidavits from these witnesses stating what they would have testified, the PCR court rejected the argument that these witnesses' testimony would have altered the outcome of his case. It noted: "No affidavits or certifications have been submitted to the court with regard to any of these witnesses which the petitioner claims his attorney should have called as a witness at trial." (Dkt. No. 9-30 at p. 28.) In light of this failure alone, the PCR

court held that Petitioner had not proven a *prima facie* case of ineffective assistance based on the other witnesses' proposed testimony.  (*Id.*)

The PCR trial court went on to address the merits, though, noting that that trial counsel had an investigator contact at least nine of the witnesses that Petitioner named.[22]  Based on feedback from the investigator, Call and Cepparulo decided that the witnesses' testimony would not likely be helpful because several of the witnesses would be hostile, and because the testimony could harm the defense by highlighting Petitioner's frequent strip club visits.  (*Id.* at pp. 30-31.)  For those potential witnesses who worked as entertainers in the strip club, trial counsel questioned the value of their testimony in the jury's eyes.  (*Id.*)

The PCR trial court acknowledged that trial counsel did not call another witness—Mark Layne Wilson—whose hotel room was directly beneath Petitioner's and who had seen the sidewalk bloodstain.  According to the PCR court, counsel did not call him because he was heavily intoxicated on the night of the murder and would be subject to extensive impeachment on the stand if called.  (*Id.* at p. 32.)  Moreover, Mr. Wilson noted that the time at which he saw the bloodstain was 2:15 am.  This was directly contradicted by several other witnesses who stated that they saw Ms. Siani alive at 2:30 pm.  Because Mr. Wilson's testimony had little credibility and would have presented contradictory testimony on the timing of the murder, the PCR court concluded that trial counsel acted strategically in not calling Mr. Wilson and, therefore, did not violate Petitioner's sixth amendment right to counsel.  (*Id.*)

Lastly, the PCR court highlighted the extensive cross-examinations that trial counsel performed, which made very clear to the jury that the police had not investigated any other leads

---

[22]  The PCR court further noted that additional investigators that were used. (Dkt. No. 9-30 at p. 30.)

during the murder investigation. There were others who had motive and opportunity to kill Ms. Siani, including marijuana and cocaine drug dealers with whom she associated, a co-worker who she had fought with in the past week, an obsessed customer of the club (Jason Francis), and a former boyfriend. For example, at trial, counsel elicited testimony from Detective Villamil that he never interviewed Jason Francis even though Francis met the physical description of a man seen talking to Ms. Siani on the night she was murdered and several other witnesses suggested that he may have been the culprit. (Dkt. No. 9-30 at pp. 22-23.)

Despite Petitioner's argument to the contrary, the PCR court's analysis is consistent with U.S. Supreme Court law. As illustrated above, the court properly identified *Strickland* and considered whether trial counsel's performance was deficient. The PCR court concluded that counsel acted reasonably because each of the decisions not to call one of the aforesaid witnesses was strategic. The court's conclusion is consistent with evidence in the record.

As for Petitioner's wife's testimony, Petitioner presented the PCR trial court with a certification from her. She indicated, in the certification:

> In March, 2000 and for several months prior thereto, I had encouraged my husband to refrain from driving after drinking alcohol. I was fully aware that my husband would often stay at the Econolodge Motel after drinking an excessive amount of alcohol at Diva's …. I suggested to him that he make extra sets of keys so that he had other keys available should he lose them. I can also attest to the fact that [he] was not always able to retrieve his keys since he did not always know their location on the mornings following an alcohol binge. I also know from conversations with my husband . . . and others that staff members from Diva's and other patrons would often take [his] keys from him after he drank too much. I have personal knowledge that on more than one occasion, my husband . . . claimed that he did not receive his keys back from Diva's. By March of 2000, my husband and I had no less than five extra keys to [his] truck which were located at our home ….

(Dkt. No. 9-23 at pp. 26-27.)

While, at first glance, these statements may suggest that her testimony would demonstrated that Petitioner left spare keys at Diva's, upon closer investigation, it does not. She states that she told him to make spare keys, and that they have spare keys at their home. But, as for the keys ostensibly kept at Diva's, she only notes that Petitioner and others have told her that he left keys there—she did not state that she has her own personal knowledge of the keys being left there. Moreover, notes from trial counsel Call's file indicates that he had considered having Petitioner's wife testify but that her testimony would have included that she "tolerated" his drinking and strip club partying, and that she had always been aware of Petitioner's strip club visits. (Dkt. No. 9-46 at pp. 63-64.) She would have further testified that they considered his time at the club as a "break" from each other, and she had encouraged him to stay over at the hotel when he was drinking. (*Id.* at p. 63.) Therefore, it was reasonable for the PCR trial court to conclude that trial counsel strategically chose not to call her as a witness because her testimony would have accentuated Petitioner's visits to the strip club, and because her potential "keys defense" related testimony was not as strong as Petitioner now characterizes it to be.

As for the remaining witnesses, there are multiple investigative reports in the record evincing the investigator's interviews with potential witnesses. (*See, e.g.*, Dkt. No. 9-34 at pp. 11-15.) Many of the potential witnesses were employees of Diva's, so the PCR trial court reasonably concluded that trial counsel strategically chose not to call these witnesses and further highlight Petitioner's strip club visits. Although Petitioner may have wanted trial counsel to parade in a number of witnesses at trial, counsel were not obligated to do so when they believed that doing so would cause Petitioner more harm than good. *See Blystone v. Horn*, 664 F.3d 397, 423 (3d Cir. 2011) ("[t]he right to counsel does not require that a criminal defense attorney leave no stone and no witness unpursued.") (quoting *Jermyn v. Horn,* 266 F.3d 257 (2001)). And, as

the PCR court noted, Petitioner himself chose not to testify and tell the jury about the multiple keys he had made and left at Diva's.[23]

Furthermore, as the PCR court explained, counsel took pains to highlight the police's failure to investigate other leads. Having heard these cross-examinations, the jury still believed that Petitioner was the murderer. The jury's implicit approval of the police's failure to investigate alternate leads suggests that the jury would not have acquitted Petitioner had Petitioner's wife and the other witnesses testified about Petitioner's frequent intoxication and prior DUI, and how often he lost his truck keys. Nor has Petitioner shown that the jury would have been positively influenced by the testimony of entertainers from the strip club. As noted above, it was reasonable for the PCR court to conclude that their testimony would have damaged Petitioner's image by further highlighting his frequent trips to the club.

Finally, while the PCR court did not expressly reject Petitioner's claim on prejudice grounds under *Strickland*, it could have. There was sufficient evidence from which the jury could have connected Petitioner to the blood in the truck and the bloodstain beneath his hotel window. It was also undisputed that Petitioner was the last person seen with Ms. Siani while she was alive. Moreover, during cross-examination of Ms. Rebecca Yavorsky, the co-worker and friend of Ms. Siani that last saw her alive when she went into the hotel with Petitioner, trial counsel Cepparulo did elicit from her that she knew Petitioner had spare keys at the club. (Dkt. No. 9-77 at pp. 79.) Therefore, even if the PCR court's stated rationale was contrary to or an unreasonable application of federal law, and this Court engaged in a *de novo* analysis of Petitioner's ineffective assistance claim, this Court would conclude that Petitioner has not

---

[23] Trial counsel Call suggests in his certification that Petitioner's poor performance on a polygraph examination and at a mock cross-examination may have influenced his decision not to testify. (Dkt. No. 9-29 at p. 25.)

demonstrated that he was prejudiced by his trial counsels' conduct. *See Dennis*, 834 F.3d at 284 (stating that, on federal habeas review, courts should "evaluate the state court's analysis and review *de novo* any properly presented alternative ground(s) supporting its judgment"). For these reasons, this Court concludes that the PCR court's ruling is not contrary to or an unreasonable application of *Strickland*. Therefore, this alleged instance of ineffective assistance cannot form a basis for the cumulative claim.

### 5. Cumulative Ineffective Assistance

Having considered each of Petitioner's contentions that he has put forth in connection with his cumulative ineffective assistance claim, the Court concludes that he has not demonstrated that he is entitled to habeas relief. Because Petitioner cannot demonstrate that the PCR trial court's conclusion regarding the reasonableness of counsels' conduct was erroneous, he also cannot demonstrate that the court's cumulative ineffective assistance ruling was faulty. Moreover, even if this Court had concluded that the PCR trial court erred, and that some of counsels' conduct was objectively unreasonable, Petitioner would still have to show, under *Fahy*, that he was actually prejudiced by the alleged errors of his trial counsel. 516 F.3d at 205.

Where there is "weighty evidence of guilt in the record," *id.*, a petitioner faces a steep climb in demonstrating this sort of prejudice, and the substantial circumstantial evidence presented at trial against Petitioner makes it unlikely that he could successfully make that climb. He was the last person seen with Ms. Siani by two witnesses—Ms. Yavorsky and the local police officer. Ms. Siani's bloodstain was found beneath his hotel room window and Dr. Presswalla opined that her injuries made clear that she had been dropped onto the sidewalk from 15 feet, which was the distance from Petitioner's hotel room to the sidewalk. Ms. Siani's blood-borne DNA was found in the bed liner and underneath Petitioner's red truck, the same truck that was

caught on videotape crossing the turnpike bridge with Ms. Siani's body in the back of it. Lastly, the evidence showed that even though Petitioner cleaned his truck after he returned home, enough of the bloodstains remained for the New Jersey state police laboratory to perform its DNA analysis. Accordingly, for the reasons stated above, Petitioner's Ground 2 is denied.

C.     Ground 3 - Ineffective Assistance of Appellate Counsel

In his Petition, Petitioner claims that his appellate counsel was "prejudicially ineffective on direct review," and notes that he relies on his *pro se* brief filed on his initial PCR in the state court to explicate his claims. (Dkt. No. 1 at p. 5). It is not entirely clear whether Petitioner also intended to incorporate into the petition those appellant counsel arguments made by his PCR counsel. The record reveals that two appellate counsel claims were asserted by counsel. It was argued that appellate counsel should have raised trial counsel's failure to present evidence at trial that another person murdered Ms. Siani. (*See* Dkt. No. 9-18 at p. 2.) Additionally, in this brief, counsel argued that appellate counsel failed to challenge his trial counsel's decision not request a jury instruction on territorial jurisdiction. (*Id.*) [24]

The Court need not determine which specific appellate counsel decisions Petitioner intended to challenge, however. Petitioner has not succeeded on any of his claims, other than the original New Jersey Appellate Division reversal, which was vacated by the New Jersey Supreme Court. Because of this, Petitioner's appellate counsel could not have been ineffective. Indeed, this is what the PCR trial court held—that Petitioner's failure to demonstrate that his trial counsel were ineffective doomed his attendant appellate counsel ineffective assistance claim.

---

[24] Counsel filed several supplemental briefs throughout the initial PCR proceedings, but no additional appellate counsel claims were raised in them. (*See* Dkt. No. 9-19 (Suppl. Ltr. Brief); Dkt. No. 9-21 (Am. Pet. for Post-Conviction Relief); Dkt. No. 9-23 (Sec. Am. Pet. in Supp. of Post-Conviction Relief)).

(Dkt. No. 9-30 at p. 34.)  This ruling is consistent with federal law because appellate counsel are not obligated to raise unmeritorious claims.  *See Smith v. Robbins,* 528 U.S. 259, 288 (2000) ("[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.") (citing *Jones v. Barnes*, 463 U.S. 745 (1983)).  Moreover, to the extent that Petitioner is arguing that his appellate counsel should have raised ineffective assistance of trial counsel claims on direct review, that argument lacks merit.  In New Jersey, appellate counsel typically cannot raise ineffective assistance of trial counsel claims on direct review but must raise them on PCR instead.  *State v. Hess*, 207 N.J. 123, 145 (2011).  Accordingly, Petitioner has not shown that the PCR court's denial of this claim is contrary to or an unreasonable application of *Strickland*, and Petitioner is not entitled to habeas relief on his ineffective assistance of appellate counsel claim.

D.　　Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Applying this standard, this Court finds that a certificate of appealability shall not issue in this case.

## V.　　CONCLUSION

For the foregoing reasons, Petitioner's habeas petition will be denied and a certificate of appealability shall not issue.  An appropriate order will be entered.

DATED:    June 30, 2017

s/Robert B. Kugler
ROBERT B. KUGLER
United States District Judge